MILLER RUBBER CO. v. De LASKI & THROPP CIRCULAR WOVEN
TIRE CO.

(Circuit Court of Appeals, Sixth Circuit. May 6, 1919.)

No. 3220.

1. PATENTS ☜328—TIRE-WRAPPING MACHINE—INFRINGEMENT.
    The DeLaski and Thropp patent, No. 1,011,450, relating to a tire-wrapping machine, claims 1, 2, 3, 4, 7, 8, 10, 11, 13, and 20, *held* infringed by defendant by the use of a machine purchased by, and of two machines built for, it.

2. PATENTS ☜317—INFRINGEMENT—INJUNCTION.
    Where the evidence warrants the conclusion that the infringement of patent involved in the construction and use of machines by defendant was purposeful and inexcusable, and committed under circumstances calculated to arouse just apprehension that it would be persisted in, the remedy is to be found in equity and injunction.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Ohio; D. C. Westenhaver, Judge.

Suit in equity by the De Laski & Thropp Circular Woven Tire Company against the Miller Rubber Company. From a decree for plaintiff, defendant appeals. Affirmed.

Wm. F. Hall, of Washington, D. C., for appellant.
E. Clarkson Seward, of New York City, for appellee.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

WARRINGTON, Circuit Judge. This suit grew out of alleged infringement of letters patent No. 1,011,450, issued December 12, 1911, to Albert De Laski and Peter D. Thropp, assignors to the De Laski &

Thropp Circular Woven Tire Company, plaintiff appellee. The Miller Rubber Company, defendant appellant, denies both invention and infringement. A preliminary injunction was granted, and later the cause was tried in open court upon its merits. This resulted in an opinion and decree adjudging validity of the patent as to the claims in suit (1, 2, 3, 4, 7, 8, 10, 11, 12, 13, and 20), and their infringement, and also in the present appeal.

The invention relates to a tire-wrapping machine; and in the Third Circuit the same claims of the patent as are in issue here were held valid and infringed. De Laski & Thropp Circular Woven Tire Co. v. William R. Thropp & Sons Co. (D. C.) 218 Fed. 458, affirmed upon appeal of Thropp & Sons Co. in 226 Fed. 941, 141 C. C. A. 545 (C. C. A. 3). Before the instant suit was commenced, appellant had purchased of appellee one of its make of tire-wrapping machines and is still operating it. Appellant had also purchased of the William R. Thropp & Sons Company a tire-wrapping machine which appellee claims was like the infringing device involved in the Third Circuit suit before cited; and appellant had also caused to be constructed, and it is still using, two tire-wrapping machines which appellee maintains were built in accordance with the patent in suit. The last three machines are the basis of the charge of infringement. We thus come to the question of validity of the patent in suit.

We cannot think it necessary or appropriate to discuss the question of invention. The devices alleged to be infringements in the instant case are so nearly related in form and substance to the device condemned as an infringement in the case passed on in the Third Circuit, and the opinions there rendered by the District Court and the Court of Appeals alike are so full and so well considered, as to persuade us that another opinion on the subject of validity of the patent could serve no useful purpose. The present case is "peculiarly one for the application of the doctrine of comity." Courtney v. Croxton, 239 Fed. 251, 152 C. C. A. 239 (C. C. A. 6). It is true, as regards the prior art, that appellant relies on some patents that do not appear in the opinions of the Third Circuit case. Assuming that appellant's new citations are all relevant and that the excluded Midgley patent was admissible, we are unable to find in them anything of present importance in view of the patents considered in those opinions.

The infringement depends upon whether the use of the machines which appellant admittedly operated, in addition to the one it purchased of appellee, included the pressure head or its equivalent of the patent in suit. The pressure head is composed of mechanism disposed above and below the apex of an arch frame extending upwardly from the surface of the table carrying the tire and its assembled parts during the wrapping operation. The mechanism comprises (1) a tripod suspended within the arch, having rollers mounted on its lower ends, and designed to transmit heavy pressure to the mold and the mold rings and through them to the tire, in order to prevent dislodgement and expansion of the tire in the wrapping process; and (2) appliances for exerting and releasing such pressure and consisting either of a screw engaging the top of the tripod and operated by a wheel, or of a cylinder and piston

disposed at the top of the tripod and operated by compressed air or steam. The pressure heads in dispute here are all of this latter type.

There are several remarkable features touching the use of this pressure head. After appellant put into operation the machine it had bought of appellee, it purchased and used the Thropp & Sons Company machine; later, although it had meanwhile been notified by appellee that it was infringing the patent in suit, appellant employed another manufacturer to construct two machines substantially like the machine it had acquired of appellee, and put them into operation. We think the evidence fairly shows that the machine so acquired of Thropp & Sons Company and the machines so constructed each contained this pressure head; indeed this is scarcely open to doubt in view of two corroborating circumstances: First, that after March, 1915, possibly after the Third Circuit case was ultimately decided (August 9, 1915), Thropp & Sons Company notified appellant to remove the pressure head from the machine purchased of it, if the machine was still in use; and, second, some months before the instant suit was begun, appellant was advised by its own counsel to remove the pressure heads from the two machines it had caused to be constructed. It is not necessary to state the inferences to which this situation gives rise. However, appellant seeks in several ways to show that what happened did not amount to material infringement; and it insists that the appellee should be denied the right to maintain its present action in equity, and be remitted to an action at law.

It was sought to show, for example, that the machine obtained from Thropp & Sons Company was never used in a commercial sense; that is, it was only used for wrapping a small number of tires, and this "experimentally." The machine was purchased in May, 1913, and appellant's witnesses differ as to the length of time it was in use; its superintendent saying that it was not used after September of that year, and its assistant engineer saying that he knew it was not used after January, 1914. It seems to have been kept in the tire-wrapping room for about two years, when it is said it was "scrapped"—i. e., placed in the salvage department—the superintendent testifying:

"At the time this suit was brought the machine was in the salvage department. I cannot tell you why we did not send it back and ask the return of our money, when we found it was not satisfactory. I think that just slipped my mind; if I had thought of it earlier, I might have sent it back, don't you know. The machine cost $1,500."

Whatever else might be said of such a showing, it is inconsistent with the practically admitted length of time the machine was kept in use, and moreover, it is observable that no claim is made that the pressure head was ever removed.

The showing made as to the two machines appellant caused to be constructed is different. Admittedly they were installed and put into use in March, 1915. Appellant offered testimony to the effect that the pressure heads of the machines were removed before the instant suit was commenced (September 17, 1915); but its testimony is indefinite as to the time of removal, ranging from two weeks after the machines were placed in the tire-wrapping room, until the "summer" of 1915.

It is enough to say of this that appellee presented testimony which in our view is convincing that the machines were regularly operated with their pressure heads until at least October, 1915—something like a month after this suit was begun.

Appellant seeks in another way, however, to meet the charge of infringement as respects the two machines so constructed for it. It insists that the valves of these machines must be presumed to have been like those of the machine it had purchased of appellee in 1911; and it offered testimony to the effect that the valves within the pressure-head mechanism of the original machine do not admit of downward pressure but only of upward pressure, claiming that they are three-way, instead of two-way, valves. This is to urge that appellee manufactured and sold to appellant a machine which was not constructed in accordance with the patent in suit; yet it is shown in appellee's opening brief, and is not contradicted, that the secretary and general manager of appellant stated, in an affidavit filed under the motion for preliminary injunction in this cause, that appellee had represented that it "was manufacturing under" the patent in suit, and that the affiant further said:

"In general construction, such machine [the one purchased of appellee] is substantially like the machine of the patent as defined by the claims in suit. * * * This machine was installed in the tire-wrapping department of" appellant "and has been used continuously since about the 1st of January, 1912, in the commercial production of automobile tires."

The patent in suit—in specification, drawings, and claims alike—clearly shows, and nothing to the contrary is suggested, that its pressure-head mechanism provides for both downward and upward pressure largely in excess of the mass weight of the tripod. It appears that many machines of appellee's make have been sold and put into operation. Appellee's expert testified that he had examined and tested some of these machines with great care, and had found that where a five-inch piston was used the pressure exerted on the tire was something like 1,700 pounds; and the pressure mechanism of the machine appellant bought of appellee has a five-inch piston. The natural inference then—indeed, the presumption—is that the pressure capacity of this machine was the same as that of the other machines produced by appellee; and any claim that appellant's particular machine was not constructed according to the patent, that it was exceptional in this regard, ought to be supported by clear and convincing testimony. There is not the slightest showing that appellee ever built or sold any other machine with this exceptional feature, and we are not satisfied that it did so in this instance.

What is shown touching the presence of three-way valves in the machine obtained from appellee is that Mr. Brucker, appellant's assistant mechanical engineer, discovered them, and was "surprised" by the discovery, just before the trial of this cause in the court below, some six years after appellant had put the machine into operation; but, upon pure hearsay, he stated that "at one time on this original Thropp machine * * * there had been such [three-way] valves with one of the ports plugged up with lead, and that the lead would blow out sometimes." It is to be inferred that this reference to "Thropp machine"

meant the machine obtained of appellee, and it is clear that the valves alluded to were in practical effect two-way valves, since the statement is only that the "lead would blow out sometimes"; and this implies that each port so filled with lead was closed again in the same way, and also is suggestive of what a simple matter it would have been to replace the three-way valves with two-way valves. The witness illustrated his understanding of the valves by a sketch which appears in the record, and stated that "when the air was turned on * * * there was no pressure forcing this tripod down." Another witness in substance testified to the same result, though not with the particularity of the first one.

It will be observed that according to these witnesses the effect of the introduction of compressed air into the cylinder was to exert upward, but not downward, pressure. This would seem to signify that no compressed air was ever introduced into the cylinder through its upper port, and hence that compressed air was not used to cushion the action of the piston in its upward movement. Mr. Waterman, appellee's expert witness, testified:

"If plaintiff's [appellant's] machine had a three-way valve arranged as per Mr. Brucker's sketch, there would be nothing to bring this head down gradually. At the time of going up the action would be to raise the head, but there would be nothing to prevent knocking the head out when it got up. It would hit the top of the cylinder like a hammer, if it had force enough to push it up, and in coming down with the valves arranged as Mr. Brucker has shown them in his sketch there is complete equalization of pressure. Consequently there is nothing to prevent it from literally falling down. * * * Such action as here shown is entirely impracticable."

We think this interpretation of the conditions described by appellant's witnesses is manifestly right. It hardly is conceivable that such conditions could ever have existed save only for the time necessary to rectify them; and the only possible explanation of their existence, assuming that they did exist, is to be found in the hearsay testimony before pointed out. On that theory any port, the lead filling of which had been "blown out," could readily be refilled and the valve restored in effect to a two-way valve. Upon any rational view, then, of the evidence, it must result that the machine obtained of appellee was built and substantially maintained in accordance with the patent in suit. We may therefore concede the presumption claimed by appellant that the valves of the two new machines were like those of the old machine; but we must add that the clear tendency of the evidence is that the new machines were built according to the showing of the patent, and the fact already stated that appellant was advised by its own counsel to remove the heads of these machines is of itself a contradiction of its present contention that they were equipped with three-way valves. If the views thus expressed in relation to the valves of the old machine and those of the two new machines are at all correct, they are a complete answer to a claim urged by appellant that the pressure-head mechanism of the patent in suit is not necessary to the wrapping of its particular type of tire. Argument is not necessary to show the inconsistency of this claim with the years of use appellant has actually made of the old machine, not to speak of the use made of the new machines.

[1, 2] It results that appellant's testimony fails to avoid the effect of its use alike of the Thropp & Sons Company machine and the two machines built for it; and we regard such use, particularly of the last-mentioned machines, as amounting to material infringement. This conclusion is strengthened by that of the trial judge, who saw and heard the witnesses while they were testifying. We are constrained to say, moreover, that the evidence warrants the conclusion that the infringement involved in the construction and use of the two new machines was purposeful and inexcusable, and was committed under circumstances calculated to arouse just apprehension that it would be persisted in. Whatever, then, the extent of infringement may ultimately prove to be, we agree with Judge Westenhaver that in the circumstances here shown the remedy is to be found in equity and through process of injunction. General Electric Co. v. New England Electric Mfg. Co., 128 Fed. 738, 740, 63 C. C. A. 448 (C. C. A. 2); Woodworth v. Stone, 3 Story, 749, 752, Fed. Cas. No. 18,021, opinion by Mr. Justice Story; Johnson v. Foos Mfg. Co., 141 Fed. 73, 79, 72 C. C. A. 105 (C. C. A. 6); Westinghouse Mach. Co. v. Press Pub. Co., 127 Fed. 822, 827 (C. C.).

The decree must be affirmed.